# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## NOTICE OF ENTRY OF
## JUDGMENT ACCOMPANIED BY OPINION

### OPINION FILED AND JUDGMENT ENTERED: 06/08/2017

The attached opinion announcing the judgment of the court in your case was filed and judgment was entered on the date indicated above. The mandate will be issued in due course.

Information is also provided about petitions for rehearing and suggestions for rehearing en banc. The questions and answers are those frequently asked and answered by the Clerk's Office.

Costs are taxed against the appellant in favor of the appellee under Rule 39. The party entitled to costs is provided a bill of costs form and an instruction sheet with this notice.

The parties are encouraged to stipulate to the costs. A bill of costs will be presumed correct in the absence of a timely filed objection.

Costs are payable to the party awarded costs. If costs are awarded to the government, they should be paid to the Treasurer of the United States. Where costs are awarded against the government, payment should be made to the person(s) designated under the governing statutes, the court's orders, and the parties' written settlement agreements. In cases between private parties, payment should be made to counsel for the party awarded costs or, if the party is not represented by counsel, to the party pro se. Payment of costs should not be sent to the court. Costs should be paid promptly.

If the court also imposed monetary sanctions, they are payable to the opposing party unless the court's opinion provides otherwise. Sanctions should be paid in the same way as costs.

Regarding exhibits and visual aids: Your attention is directed Fed. R. App. P. 34(g) which states that the clerk may destroy or dispose of the exhibits if counsel does not reclaim them within a reasonable time after the clerk gives notice to remove them. (The clerk deems a reasonable time to be 15 days from the date the final mandate is issued.)

FOR THE COURT

/s/ Peter R. Marksteiner
Peter R. Marksteiner
Clerk of Court

16-2097 - New World International, Inc. v. Ford Global Technologies, LLC
United States District Court for the Northern District of Texas, Case No. 3:15-cv-01121-M

# United States Court of Appeals for the Federal Circuit

_____

**NEW WORLD INTERNATIONAL, INC., NATIONAL AUTO PARTS, INC.,**
*Plaintiffs-Appellants*

**v.**

**FORD GLOBAL TECHNOLOGIES, LLC,**
*Defendant-Appellee*

_____

2016-2097

_____

Appeal from the United States District Court for the Northern District of Texas in No. 3:15-cv-01121-M, Judge Barbara M.G. Lynn.

_____

Decided: June 8, 2017

_____

ROBERT G. OAKE, JR., Oake Law Office, Allen, TX, argued for plaintiffs-appellants.

SEAN MAROTTA, Hogan Lovells US LLP, Washington, DC, argued for defendant-appellee. Also represented by JESSICA L. ELLSWORTH; FRANK A. ANGILERI, MARC LORELLI, LINDA D. METTES, Brooks Kushman P.C., Southfield, MI.

_____

2          NEW WORLD INT'L, INC. v. FORD GLOBAL TECHS., LLC

Before PROST, *Chief Judge,* BRYSON and WALLACH,
*Circuit Judges.*

BRYSON, *Circuit Judge.*

New World International, Inc., and National Auto Parts, Inc., (collectively, "New World") appeal from a final decision by the United States District Court for the Northern District of Texas dismissing New World's declaratory judgment complaint for lack of personal jurisdiction over defendant-appellee Ford Global Technologies, LLC ("FGTL"). We affirm.

I

A

FGTL is a wholly owned subsidiary of the automaker Ford Motor Company. Both FGTL and the Ford Motor Company are incorporated in Delaware and headquartered in Michigan. FGTL does no business in Texas and neither maintains an office nor has any employees in Texas.

FGTL does not make or sell automobiles or automotive products; it owns, manages, and licenses intellectual property for the Ford Motor Company. FGTL'S portfolio includes several design patents, including U.S. Design Patent No. D489,299 ("the '299 patent"), which claims the design of a vehicle hood exterior, and Design Patent No. D501,685 ("the '685 patent"), which claims the design of a vehicle head lamp.

FGTL licensed the '299 and '685 patents to LKQ Corp. ("LKQ"), an entity incorporated in Delaware and headquartered in Illinois. The license agreement between FGTL and LKQ designates LKQ as the exclusive licensee for the importation and sale of non-original equipment

NEW WORLD INT'L, INC. v. FORD GLOBAL TECHS., LLC          3

aftermarket products in the United States.[1]  LKQ does business in all 50 states, including Texas.

The license agreement states that "LKQ has no right, title or interest in or to the FGTL Design Patents" beyond selling the aftermarket products as provided in the agreement, and that LKQ does not have the right to grant sublicenses.  The agreement further provides that FGTL and LKQ each operate as "an independent contractor in the performance of each and every part of the license," and that neither "has the power or authority to act as agent, employee or in any other capacity to represent, act for, bind or otherwise create or assume any obligation on behalf of the other party for any purpose whatsoever."  In addition, the agreement provides that LKQ may not reference its relationship to Ford or FGTL in any of LKQ's marketing materials regarding the royalty products, and that LKQ must attach to each of those products a label that reads "Non Original Equipment Aftermarket Part."  The agreement does not otherwise control LKQ's market-ing of the royalty products.

The license agreement details the relationship be-tween FGTL and LKQ regarding infringement claims against third parties.  If LKQ learns of potentially infring-

---

[1]    The parties disputed below whether the license was exclusive, as the license expressly states that it does not "prohibit FGTL and Ford Associated Companies from making, having made, importing, exporting, selling, offering for sale[,] distributing or licensing any products." On appeal, FGTL maintains that "Ford and its affiliates can compete—and do compete—with LKQ in the U.S. market for repair and aftermarket products."  FGTL Br. at 19.  We do not resolve that dispute but conclude that personal jurisdiction is lacking even assuming, as the district court did, that the license is exclusive.

4            NEW WORLD INT'L, INC. v. FORD GLOBAL TECHS., LLC

ing conduct by a third party, LKQ must notify FGTL in writing. The agreement then provides:

> FGTL will have the right to determine what action, if any, is to be taken in each such instance, but shall not unreasonably refuse a request by LKQ to enforce the Ford Design Patents against allegedly-infringing use in conflict with LKQ's rights under th[e] [License] Agreement. If FGTL decides to take any action at LKQ's request, LKQ agrees . . . to become a party to such action if necessary, and to cooperate with FGTL, in the prosecution of any such action or proceeding involving any alleged infringement respecting FGTL's rights in the Ford Design Patents.

The license agreement also addresses potential third-party claims of design patent infringement against LKQ based on LKQ's sales of the aftermarket products. For such claims, the agreement provides that FGTL will indemnify LKQ for any design patent suits against LKQ initiated by third parties.

                              B

New World is a Texas company with headquarters in Texas. In September 2011, FGTL sent New World a cease and desist letter accusing New World of infringing the '299 and '685 patents by selling various parts meant for use on Ford vehicles. The letter informed New World that LKQ had been granted an exclusive license to import and sell those products, and that New World had not obtained the accused products from LKQ in an authorized manner.

On May 21, 2013, FGTL sent another letter to New World, providing New World with a "partial list" of Ford design patents and again requesting that New World cease and desist selling various parts for Ford vehicles. FGTL also informed New World that LKQ "may be able to

NEW WORLD INT'L, INC. v. FORD GLOBAL TECHS., LLC          5

assist" with New World's "disposal" of the accused prod-ucts, and stated that "LKQ will contact you directly."

New World requested a license to sell the accused products.  On June 11, 2013, FGTL responded that a license option was not available; that FGTL had contacted its litigation counsel, who would contact New World; and that FGTL had asked LKQ to contact New World about the disposal of the accused products in New World's possession.

In June 2013, LKQ contacted New World "regarding the recent 'cease and desist' letter" from FGTL.  LKQ asked that New World call LKQ "to review the details of [New World's] inventory" in order to "determine the most prudent disposal method."

Litigation counsel for FGTL sent New World another cease and desist letter on November 13, 2013.

On January 29, 2015, FGTL sued New World and its Internet retailer, Auto Lighthouse Plus, LLC, in the United States District Court for the Eastern District of Michigan, charging them with willful infringement of nine patents, including the '299 and '685 design patents. *Ford Global Techs., LLC v. New World Int'l, Inc.,* No. 2:15-cv-10394 (E.D. Mich.).  FGTL later filed an amended com-plaint that dropped the claims under the '299 and '685 design patents.

## C

On April 14, 2015, New World filed the present suit in the Northern District of Texas seeking a declaratory judgment of noninfringement and invalidity with regard to the '299 and '685 design patents.  FGTL moved to dismiss the complaint for lack of personal jurisdiction. Relevant to this appeal, New World asserted that the district court had specific personal jurisdiction over FGTL.

As to that theory, the district court noted that, under controlling Federal Circuit law, FGTL's cease and desist letters sent to New World in Texas were not sufficient to establish jurisdiction over FGTL. The court then assessed FGTL's license agreement with LKQ. The court determined that the license did "not impose continuing obligations on FGTL to enforce or defend the patents in Texas nor give LKQ an independent right to enforce those patents, and it does not give FGTL control over LKQ's business operations." Therefore, the court concluded, the license agreement did not provide the court with specific personal jurisdiction over FGTL in the declaratory judgment suit, and the court accordingly dismissed the complaint.

After the dismissal, New World filed a motion for reconsideration and a motion for leave to file an amended complaint to add further allegations in support of specific jurisdiction. Regarding the motion for reconsideration, the court acknowledged a factual error in its previous dismissal order but concluded that, even with the error corrected, the court still lacked specific personal jurisdiction over FGTL. The court denied New World's motion for leave to file an amended complaint as untimely.

## II

### A

"Personal jurisdiction is a question of law that we review *de novo.*" *Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1016 (Fed. Cir. 2009). We review the pleadings and other submitted evidence in the light most favorable to New World. *Id.* at 1017. Because the complaint involves issues of patent infringement and validity, we apply Federal Circuit law to the jurisdictional issue. *Id.* at 1016.

A court has personal jurisdiction over a nonresident defendant if the forum state's long-arm statute permits

NEW WORLD INT'L, INC. v. FORD GLOBAL TECHS., LLC        7

service of process and the assertion of personal jurisdiction comports with due process. *Xilinx, Inc. v. Papst Licensing GmbH & Co. KG*, 848 F.3d 1346, 1352 (Fed. Cir. 2017). "Because Texas's long-arm statute extends to the limits of federal constitutional due process, only [the latter] inquiry is required." *Companion Prop. & Cas. Ins. Co. v. Palermo*, 723 F.3d 557, 559 (5th Cir. 2013).

For personal jurisdiction, the nonresident defendant must have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). For minimum contacts in the context of specific jurisdiction, the plaintiff must show that the defendant "has purposefully directed his activities at residents of the forum, and [that] the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *see also id.* at 475 & n.18. If those minimum contacts are sufficient, the defendant may point to other factors "to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Id.* at 476. This court has articulated those requirements in the form of a three-part test: "(1) whether the defendant 'purposefully directed' its activities at residents of the forum; (2) whether the claim 'arises out of or relates to' the defendant's activities with the forum; and (3) whether assertion of personal jurisdiction is 'reasonable and fair.'" *Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1360 (Fed. Cir. 2001).

Under the first two parts of the test, as applied in the patent context, the question is what minimum contacts are necessary to establish personal jurisdiction over a nonresident defendant for a declaratory judgment of noninfringement or invalidity of a patent. This court has acknowledged that the defendant purposefully directs his activities at residents of the forum when the defendant

sends a cease and desist letter to a potential plaintiff in that particular forum. And a subsequent declaratory judgment action by that potential plaintiff "arises out of or relates to" the defendant's activity—namely, the cease and desist letter. Under the third part of the test, however, this court has held that it is improper to predicate personal jurisdiction on the act of sending ordinary cease and desist letters into a forum, without more. *Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1360-61 (Fed. Cir. 1998) (concluding that "[p]rinciples of fair play and substantial justice afford a patentee sufficient latitude to inform others of its patent rights without subjecting itself to jurisdiction in a foreign forum"); *see also, e.g.*, *Radio Sys. Corp. v. Accession, Inc.*, 638 F.3d 785, 789 (Fed. Cir. 2011); *Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356, 1363 (Fed. Cir. 2006); *Genetic Implant Sys., Inc. v. Core-Vent Corp.*, 123 F.3d 1455, 1458 (Fed. Cir. 1997).

While the act of sending cease and desist letters is insufficient by itself to trigger a finding of personal jurisdiction, other activities by the defendant, in conjunction with cease and desist letters, may be sufficient. One such activity that this court has recognized may meet the minimum contacts requirement is the grant of an exclusive license to a licensee that resides or regularly does business in the forum. *Avocent Huntsville Corp. v. Aten Int'l Co.*, 552 F.3d 1324, 1334 (Fed. Cir. 2008); *see also, e.g.*, *Breckenridge*, 444 F.3d at 1366.

To be sure, the mere existence of an exclusive license does not support a finding of specific jurisdiction. For example, a license that establishes no relationship between a patent holder and a licensee beyond the payment and receipt of royalty income is not sufficient, because a declaratory judgment action does not typically "arise from or relate to" a patent holder's efforts to license or commercialize its patent. *Avocent*, 552 F.3d at 1336; *see also Radio Sys. Corp.*, 638 F.3d at 789-90.

NEW WORLD INT'L, INC. v. FORD GLOBAL TECHS., LLC          9

On the other hand, a license that obligates the patent holder to defend or enforce the patent may be sufficient to establish specific personal jurisdiction, because a declaratory judgment action typically arises from the patent holder's actions to enforce or defend its patent in the forum. *Avocent*, 552 F.3d at 1336; *see also Autogenomics*, 566 F.3d at 1020 ("[O]nly enforcement or defense efforts related to the patent rather than the patentee's own commercialization efforts are to be considered for establishing specific personal jurisdiction in a declaratory judgment action against the patentee.").

Several earlier decisions of this court speak to what is necessary to establish specific jurisdiction over a nonresident patent holder that has sent a cease and desist letter into the forum and entered into an exclusive license agreement with a licensee that does business in the forum. In *Akro Corp. v. Luker*, 45 F.3d 1541 (Fed. Cir. 1995), the nonresident patent holder (1) granted a resident licensee, an Ohio corporation, the right to sue alleged infringers on the patent holder's behalf and (2) agreed to "defend and pursue any infringement against [the] patent." *Id.* at 1543. The patent holder therefore incurred continuing obligations in the forum related to the enforcement or defense of the licensed patent: The resident licensee was free to sue third parties for infringement, which the patent holder was then obligated to "defend and pursue"; the patent holder assumed a complementary obligation to affirmatively pursue potential infringers of the patent; and the patent holder was obligated to defend any action challenging the patent. Even though the patent holder had "never been in Ohio and no one is or has ever been his agent or personal representative in Ohio," *id.* at 1542, the patent holder's continuing obligation to pursue any infringement clearly contemplated enforcement against any infringers in Ohio, where the licensee was based and competed with others.

10        NEW WORLD INT'L, INC. v. FORD GLOBAL TECHS., LLC

Subsequently, in *Genetic Implant Systems, Inc. v. Core-Vent Corp.*, 123 F.3d 1455 (Fed. Cir. 1997), the court held that a nonresident patent holder was subject to personal jurisdiction based both on direct marketing and sales activities in the forum before the nonresident's patent issued, and on the nonresident's execution, after the patent issued, of an exclusive agreement with a distributor whose activities were directed at the forum state. *Id.* at 1458 (nonresident patent holder "engaged in substantial activities" in Washington through its "program to develop a market in Washington, including founding teaching centers in Seattle . . . , developing Washington customer lists through the teaching centers, and advertising in publications distributed to potential Washington customers"; it then entered a worldwide exclusive distributorship agreement with a distributor that maintained sales representatives in Washington and continued to make "substantial sales" of the patent holder's product there). The court detailed the particulars of the distributorship agreement—e.g., granting the distributor the exclusive right to distribute the patented products, the authority to use the patent holder's trademark, and indemnification for liability arising from third-party infringement actions—and determined that the distributorship agreement was effectively an exclusive license. *Id.* at 1458-59. The court held that the patent holder's execution of such an exclusive arrangement, in conjunction with the cease and desist letters and the patent holder's previous activities in the forum, satisfied the requirements of due process as applied to the issue of personal jurisdiction. *Id.* at 1459.

A decade later, in *Breckenridge Pharmaceutical, Inc. v. Metabolite Laboratories, Inc.*, 444 F.3d 1356 (Fed. Cir. 2006), the court clarified that the question of specific jurisdiction over a nonresident patent holder in a case involving an exclusive license "requires close examination of the license agreement." *Id.* at 1366. Under the exclu-

NEW WORLD INT'L, INC. v. FORD GLOBAL TECHS., LLC          11

sive license agreement in *Breckenridge*, the patent holder
gave the licensee significant rights regarding the en-
forcement and defense of the patents.  Specifically, the
patent holder "granted [the licensee] the right to sue for
patent infringement with [the patent holder's] written
consent, and the parties agreed to 'discuss in good faith
the appropriate action, if any, with respect to third-party
infringers . . . and to cooperate reasonably in any en-
forcement actions.'"  *Id.* at 1366-67.  Despite retaining
some discretion regarding enforcement, the patent holder
assumed a continuing obligation to at least discuss any
enforcement action with its licensee in good faith—
including upon the licensee's request for written permis-
sion to bring a suit on behalf of the patent holder—and
then to cooperate in any subsequent action.

Those were not empty obligations; as the court ex-
plained, the "exclusive license agreement not only *con-
templated* an ongoing relationship . . . beyond royalty
payments but has *actually resulted* in such a relationship"
to enforce the patent.  *Id.* at 1367.  As seen in practice,
both parties coordinated "in sending cease and desist
letters and in litigating infringement claims in Florida
[the forum] and elsewhere," and both "are often repre-
sented jointly by counsel."  *Id.*

What matters, then, is whether the agreement be-
tween the patent holder and the exclusive licensee impos-
es an obligation on the patent holder to enforce or defend
the patent on behalf of the licensee that is engaged in
exploiting the patent rights in the forum state.  That
question is important because a patent holder's undertak-
ing of such continuing enforcement obligations to a party
that does business in the forum may qualify as purposeful
availment by the defendant of the privilege of conducting
activities within the forum state.  *See Burger King*, 471
U.S. at 479-80; *Perdue Foods LLC v. BRF S.A.*, 814 F.3d
185, 191 (4th Cir. 2016) ("[I]mplicit in the Supreme
Court's distinction between a contract—which cannot, by

itself, establish purposeful availment—and a contract
with continuing obligations—which 'manifestly' consti-
tutes purposeful availment—is the assumption that the
continuing obligations strengthen a defendant's contacts
with the plaintiff's forum.") (quoting *Burger King*, 471
U.S. at 476).

This court made that point clear in *Avocent Huntsville
Corp. v. Aten International Co.*, 552 F.3d 1324 (Fed. Cir.
2008).  The court explained that in a declaratory judg-
ment action against a nonresident patent holder, "we
have consistently required the defendant to have engaged
in 'other activities' that relate to the *enforcement* or the
*defense of the validity* of the relevant patents."  *Id.* at
1334.  One example of such an "other activity" is "entering
into an exclusive license agreement or other undertaking
which imposes enforcement obligations with a party
residing or regularly doing business in the forum."  *Id.*
Exclusive license agreements and other undertakings that
impose enforcement obligations on a patentee or its
licensee "reflect the kind of 'other activities' that support
specific personal jurisdiction in a declaratory judgment
action."  *Id.* at 1335.  Summarizing this court's prece-
dents, the *Avocent* court noted that "if the defendant
patentee purposefully directs activities at the forum
which relate in some material way to the enforcement or
the defense of the patent, those activities may suffice to
support specific jurisdiction."  *Id.* at 1336.  In particular,
the court concluded (*id.*):

> [W]hen the patentee enters into an exclusive li-
> cense or other obligation relating to the exploita-
> tion of the patent by such licensee or contracting
> party in the forum, the patentee's contractual un-
> dertaking may impose certain obligations to en-
> force the patent against infringers.  By such
> conduct, the patentee may be said to purposefully
> avail itself of the forum and to engage in activity

NEW WORLD INT'L, INC. v. FORD GLOBAL TECHS., LLC            13

that relates to the validity and enforceability of the patent.

B

New World argues that under the precedents discussed above, FGTL's license with LKQ creates the basis for a finding of specific personal jurisdiction because it imposes continuing obligations on FGTL by virtue of its character as an exclusive license—i.e., by preventing FGTL from granting a license to New World. New World also points to the indemnification and enforcement provisions as independently sufficient bases for specific jurisdiction. Those arguments are not persuasive.

1. We have already rejected the idea that the mere existence of an exclusive license, regardless of its content, establishes specific jurisdiction over the licensor. Instead, "the inquiry requires close examination of the [exclusive] license agreement," because "our case law requires that the license agreement contemplate a relationship beyond royalty or cross-licensing payment, such as granting both parties the right to litigate infringement cases." *Breckenridge*, 444 F.3d at 1366.

2. Contrary to New World's contention, we have not held that an indemnity provision is a sufficient basis for specific jurisdiction. New World points to *Genetic Implant*, where the court noted that the exclusive distributorship agreement contained a provision that required the patent holder to indemnify the distributor "for liability arising from any third-party infringement action related to [the distributor's] sale, use, or making of the [patented] products." 123 F.3d at 1459. That language appears in the court's discussion of why the exclusive distributorship agreement is, in effect, an exclusive license. The discussion begins with the statement that "[t]he appointment of a distributor to sell a product covered by a patent is analogous to a grant of a patent license" because "[s]uch an action conveys an implied license to the distributor,

14      NEW WORLD INT'L, INC. v. FORD GLOBAL TECHS., LLC

thereby surrendering the [patent holder's] right to exclude the distributor under the patent." *Id.* at 1458. The court supported its conclusion by noting that "[t]he agreement contained other provisions similar to those typically found in a patent license agreement," including the indemnity clause. *Id.* at 1459. But nothing in the opinion indicates that it was the indemnity clause that established jurisdiction over the nonresident patent holder. Instead, the court expressly stated that it was the nonresident's direct "program to develop a market in Washington" before the patent issued, plus the execution of what was in effect an exclusive license agreement, that satisfied the due process component of specific personal jurisdiction. *Id.* at 1458. New World has not alleged any comparable activity by FGTL in Texas.[2]

Nor would it make sense to hold that an indemnity provision like the one in the FGTL-LKQ license agreement independently satisfies due process. That provision requires FGTL to indemnify LKQ for design patent suits

---

[2]    New World notes that the court in *Breckenridge* referred to the indemnity agreement in *Genetic Implant* when discussing that case. *See Breckenridge*, 444 F.3d at 1365 (citing *Genetic Implant*, 123 F.3d at 1459). The *Breckenridge* court made clear, however, that it did not regard the decision in *Genetic Implant* as turning on the indemnity clause, as the court also referred to the fact that the patentee in that case authorized the distributor to use its trademarks and the fact that the defendant had conducted business in the forum state prior to entering into the exclusive distributorship agreement, "and had developed a valuable customer base and generated goodwill through advertising and educational initiatives that potentially enhanced the future sales of its exclusive distributor." *Breckenridge*, 444 F.3d at 1365 (citing *Genetic Implant*, 123 F.3d at 1458).

NEW WORLD INT'L, INC. v. FORD GLOBAL TECHS., LLC          15

initiated by third parties—e.g., a suit alleging infringement of a third party's patent by LKQ's products. But insuring LKQ against those third-party claims of infringement does not arise out of or relate to the "enforcement or the defense of the [Ford design] patent[s]," as required for specific jurisdiction in a declaratory judgment action. *Avocent*, 552 F.3d at 1336; *see also id.* (patent holder's efforts to license or commercialize its patent does not "relate in any material way to the patent right that is at the center of any declaratory judgment claim for non-infringement, invalidity, and/or unenforceability"). Thus, while other indemnity clauses could involve the enforcement or defense of the licensor's patents, the clause at issue in this case does not.

3. New World also has not demonstrated that FGTL has assumed a meaningful obligation to enforce or defend the Ford design patents under the license provisions regarding infringement suits brought against third parties. FGTL retains "the right to determine what action, if any, is to be taken in each such instance, but shall not unreasonably refuse a request by LKQ to enforce the Ford Design Patents against allegedly-infringing use in conflict with LKQ's rights under th[e] Agreement." There is no question that FGTL retains control over how to handle enforcement of the patent against infringing third parties. New World's argument turns on whether FGTL has ceded control over whether to initiate enforcement actions, given its obligation to "not unreasonably refuse a request by LKQ to enforce the Ford Design Patents."

We must therefore determine the nature and scope of that obligation. New World points to the "reasonableness" language in the license in *Breckenridge*, in which the parties agreed to "discuss in good faith the appropriate action, if any, with respect to third party infringers of the Licensed Patents, and to cooperate reasonably in any enforcement actions." 444 F.3d at 1366-67. But the court in *Breckenridge* did not base its decision merely on the

16        NEW WORLD INT'L, INC. v. FORD GLOBAL TECHS., LLC

text of the agreement in that case; rather, the court determined that the patent holder recognized that provision as a binding obligation in practice. *Id.* at 1367 (The "exclusive license agreement not only *contemplated* an ongoing relationship . . . beyond royalty payments but has *actually resulted* in such a relationship" to enforce the patent.). The court pointed out that the parties coordinated "in sending cease and desist letters and in litigating infringement claims in Florida [the forum] and elsewhere," and that both "are often represented jointly by counsel." *Id.*

New World has not alleged anything close to the facts in *Breckenridge* in its effort to show that FGTL's obligation operates similarly. FGTL sent the cease and desist letters on its own behalf or through its own litigation counsel. While FGTL copied LKQ on two of the cease and desist letters—those of May 21 and June 11, 2013—those were letters that advised New World that it could dispose of its allegedly infringing products by turning those products over to LKQ. LKQ's role was that of another recipient of the letters, not a co-sender requesting that New World cease and desist infringing the Ford design patents. LKQ's follow-up letter to New World makes that clear, as the only topic of that letter was the potential disposal of New World's infringing products. In addition, the related infringement litigation brought by FGTL in Michigan concerning New World's activities in Texas involves only FGTL, not LKQ.

That is not to say that a plaintiff must always provide evidence of how an obligation operates in practice. But according to FGTL, the text imposes only a minimal obligation, as FGTL has "the ability to decline enforcement on any commercially reasonable basis," which includes "any reasonable business, practical, or legal reason," such as "a desire not to subject itself to jurisdiction in a particular forum." FGTL Br. at 22-23 & n.4.

New World has not provided a persuasive reason to interpret the provision differently. Its only argument, made in a footnote, is that "reasonableness" is an enforceable standard under Michigan law, which governs the interpretation of the license agreement. But New World does not explain how the interpretation of the agreement under Michigan law would conflict with FGTL's interpretation.

The only pertinent Michigan case cited by New World is *Lichnovsky v. Ziebart International Corp.*, 324 N.W.2d 732 (Mich. 1982), in which the court construed a contract as not permitting termination at will and addressed, as further support, a clause that barred the licensee from assigning or transferring the agreement without the written consent of the licensor, who could not "unreasonably refuse to consent to the sale or transfer of the license agreement by the licensee." *Id.* at 737-38. That case supports the proposition that a prohibition on "unreasonable" conduct bars rejections that are wholly arbitrary or lack any justification whatsoever. That proposition, however, is not inconsistent with FGTL's argument that the "shall not unreasonably refuse" clause in the license agreement imposes only the most minimal restriction on FGTL's freedom of action with respect to its patent enforcement decisions, allowing it to pursue any course of action that it regards as being to its commercial advantage.

FGTL's reading is also supported by the language in the license agreement regarding enforcement against third parties. The license states that FGTL has "the right to determine what action, if any, is to be taken in each such instance." FGTL therefore is free to decide how to enforce the patent, or whether to enforce it at all. If LKQ requests enforcement and FGTL has no reason to refuse, then "LKQ agrees . . . to become a party to such action if necessary, and to cooperate with FGTL, in the prosecution of any such action or proceeding involving any alleged

18        NEW WORLD INT'L, INC. v. FORD GLOBAL TECHS., LLC

infringement respecting FGTL's rights in the Ford Design Patents." Therefore, in the event that FGTL grants LKQ's request to enforce FGTL's patent rights, FGTL still has control over the action and can require LKQ to cooperate. And because the license is silent about the situation in which LKQ does not request enforcement, it is clear that FGTL retains total discretion whether to pursue enforcement in that setting.[3]

In sum, under the license agreement, FGTL retains nearly complete control over the patent enforcement decision. New World has not shown that the obligations contemplated in the license have resulted in an undertaking by FGTL to enforce or defend the patents with LKQ. Therefore, although the license to the licensee doing business in the forum is exclusive, the license does not impose a sufficient obligation on the patent holder regarding the enforcement of the patent rights to subject the patent holder to specific jurisdiction there. Nor has New World pointed to any additional activities in the forum beyond the license that would give rise to specific jurisdiction. *See Burger King*, 471 U.S. at 480 (finding specific jurisdiction in Florida because "the 'quality and nature' of [the defendant's] relationship to the company in Florida can in no sense be viewed as 'random,' 'fortuitous,' or 'attenuated'"). Accordingly, FGTL's pertinent contacts

_____

[3]    New World points to two other provisions of the license as "evidenc[e] [of] continuing obligations between FGTL and LKQ regarding patent enforcement." New World is incorrect as to both. The first requires FGTL to notify LKQ of relevant pending and issued Ford design patents. That provision is directed to LKQ's awareness of what patented products it may produce, not to the enforcement or defense of the patents. The second deals with the source of LKQ's products and imposes an obligation on LKQ, not FGTL.

NEW WORLD INT'L, INC. v. FORD GLOBAL TECHS., LLC          19

with Texas are limited to the cease and desist letters. While those letters may be sufficient to constitute minimum contacts with the forum, they are not sufficient to satisfy the fairness part of the test for specific personal jurisdiction. *See Xilinx*, 848 F.3d at 1357.

III

New World argues that the district court's denial of its motion to amend the complaint to add new allegations in support of personal jurisdiction was an abuse of discretion under Rule 15(a), Fed. R. Civ. P. In response, FGTL argues that the court's earlier dismissal of the case was effectively an entry of judgment, *see Whitaker v. City of Hous.*, 963 F.2d 831, 833 (5th Cir. 1992) (order dismissing all claims is a final judgment in the absence of an objection, even if the order does not expressly state as much and the court does not enter judgment on a separate document), and that the district court's discretion to allow the amended complaint was therefore restricted, *see Vielma v. Eureka Co.*, 218 F.3d 458, 468 (5th Cir. 2000) (although court has "virtually unlimited discretion to allow amendments before the entry of judgment, that discretion narrows considerably after entry of judgment").

Without addressing whether the district court's dismissal order constituted the entry of a final judgment, we conclude that the court did not abuse its discretion by denying the motion as untimely. New World's explanation for seeking leave to amend was not the discovery of new evidence or anything similar. Rather, it believed its initial complaint was sufficient to establish jurisdiction, but that following the dismissal it wanted an opportunity to buttress its jurisdictional presentation.

That rationale does not provide a basis for concluding that the district court abused its discretion. The amendment was untimely, and New World offered no good reason for its untimeliness. *See Vielma*, 218 F.3d at 468 ("[W]e have consistently upheld the denial of leave to

20          NEW WORLD INT'L, INC. v. FORD GLOBAL TECHS., LLC

amend where the party seeking to amend has not clearly established that [it] could not reasonably have raised the new matter prior to the trial court's merits ruling.").

New World relies exclusively on *Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594 (5th Cir. 1981), in which the Fifth Circuit held that a trial court abused its discretion by denying leave to amend, which was requested after dismissal of the case. But the court's rationale in that case is not applicable here. In *Dussouy*, discovery revealed that the plaintiff's theory of the case—conspiracy between an insurance company and an investment company to restrain trade—was incorrect because the insurance company was not involved. *Id.* at 596-97. Upon learning that the insurance company was not involved, the plaintiff dismissed the insurance company and moved to amend the complaint to add different co-conspirators, a motion that the district court denied. *Id.* at 597. Thus, in *Dussouy* there was good reason for the belated motion to amend, in light of evidence that was revealed during discovery. Here, New World has not alleged the discovery of any new evidence that requires leave to amend.

After a case has been dismissed, a district court's denial of a motion to amend is not an abuse of discretion where the motion is based on the plaintiff's assertion that it thought it had done enough previously to avoid dismissal. As the district court astutely observed: "The only explanation [New World] offer[s] [in support of its motion for leave to amend] is that [it] thought [it] had adequately demonstrated jurisdiction. If this were sufficient, matters would never be final."[4]

---

[4]    New World also complains that the district court should have granted its motion for reconsideration of the dismissal order. The district court, however, explained in its corrected opinion that the material in the motion

NEW WORLD INT'L, INC. v. FORD GLOBAL TECHS., LLC          21

## AFFIRMED

---

would not have affected the dismissal.  We find no error in
that ruling and therefore uphold the district court's denial
of the motion.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## *Questions and Answers*

**Petitions for Rehearing (Fed. Cir. R. 40)
and
Petitions for Hearing or Rehearing En Banc (Fed. Cir. R. 35)**

---

*Q. When is a petition for rehearing appropriate?*

A. Petitions for panel rehearing are rarely successful because they most often fail to articulate sufficient grounds upon which to grant them. For example, a petition for panel rehearing should not be used to reargue issues already briefed and orally argued; if a party failed to persuade the court on an issue in the first instance, a petition for panel rehearing should not be used as an attempt to get a second "bite at the apple." This is especially so when the court has entered a judgment of affirmance without opinion under Fed. Cir. R. 36.  Such dispositions are entered if the court determines the judgment of the trial court is based on findings that are not clearly erroneous, the evidence supporting the jury verdict is sufficient, the record supports the trial court's ruling, the decision of the administrative agency warrants affirmance under the appropriate standard of review, or the judgment or decision is without an error of law.

*Q. When is a petition for hearing or rehearing en banc appropriate?*

A. En banc decisions are extraordinary occurrences. To properly answer the question, one must first understand the responsibility of a three-judge merits panel of the court. The panel is charged with deciding individual appeals according to the law of the circuit as established in the court's precedential opinions. While each merits panel is empowered to enter precedential opinions, the ultimate duty of the court en banc is to set forth the law of the Federal Circuit, which merit panels are obliged to follow.

Thus, as a usual prerequisite, a merits panel of the court must have entered a precedential opinion in support of its judgment for a suggestion for rehearing en banc to be appropriate. In addition, the party seeking rehearing en banc must show that either the merits panel has failed to follow identifiable decisions of the U.S. Supreme Court or

Federal Circuit precedential opinions or that the merits panel has followed circuit precedent, which the party seeks to have overruled by the court en banc.

*Q. How frequently are petitions for rehearing granted by merits panels or petitions for rehearing en banc accepted by the court?*

A. The data regarding petitions for rehearing since 1982 shows that merits panels granted some relief in only three percent of the more than 1900 petitions filed. The relief granted usually involved only minor corrections of factual misstatements, rarely resulting in a change of outcome in the decision.

En banc petitions were accepted less frequently, in only 16 of more than 1100 requests. Historically, the court itself initiated en banc review in more than half (21 of 37) of the very few appeals decided en banc since 1982. This sua sponte, en banc review is a by-product of the court's practice of circulating every precedential panel decision to all the judges of the Federal Circuit before it is published. No count is kept of sua sponte, en banc polls that fail to carry enough judges, but one of the reasons that virtually all of the more than 1100 petitions made by the parties since 1982 have been declined is that the court itself has already implicitly approved the precedential opinions before they are filed by the merits panel.

*Q. Is it necessary to have filed either of these petitions before filing a petition for certiorari in the U.S. Supreme Court?*

A. No. All that is needed is a final judgment of the Court of Appeals. As a matter of interest, very few petitions for certiorari from Federal Circuit decisions are granted. Since 1982, the U.S. Supreme Court has granted certiorari in only 31 appeals heard in the Federal Circuit.  Almost 1000 petitions for certiorari have been filed in that period.

October 20, 2016

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## INFORMATION SHEET

## FILING A PETITION FOR A WRIT OF CERTIORARI

There is no automatic right of appeal to the Supreme Court of the United States from judgments of the Federal Circuit. You must file a petition for a writ of certiorari which the Supreme Court will grant only when there are compelling reasons. (See Rule 10 of the Rules of the Supreme Court of the United States, hereinafter called Rules.)

**Time.** The petition must be filed in the Supreme Court of the United States within 90 days of the entry of judgment in this Court or within 90 days of the denial of a timely petition for rehearing. The judgment is entered on the day the Federal Circuit issues a final decision in your case. [The time does not run from the issuance of the mandate, which has no effect on the right to petition.] (See Rule 13 of the Rules.)

**Fees.** Either the $300 docketing fee or a motion for leave to proceed in forma pauperis with an affidavit in support thereof must accompany the petition. (See Rules 38 and 39.)

**Authorized Filer.** The petition must be filed by a member of the bar of the Supreme Court of the United States or by the petitioner representing himself or herself.

**Format of a Petition.** The Rules are very specific about the order of the required information and should be consulted before you start drafting your petition. (See Rule 14.) Rules 33 and 34 should be consulted regarding type size and font, paper size, paper weight, margins, page limits, cover, etc.

**Number of Copies.** Forty copies of a petition must be filed unless the petitioner is proceeding in forma pauperis, in which case an original and ten copies of the petition for writ of certiorari and of the motion for leave to proceed in forma pauperis. (See Rule 12.)

**Where to File.** You must file your documents at the Supreme Court.

**Clerk**
**Supreme Court of the United States**
**1 First Street, NE**
**Washington, DC 20543**
**(202) 479-3000**

No documents are filed at the Federal Circuit and the Federal Circuit provides no information to the Supreme Court unless the Supreme Court asks for the information.

**Access to the Rules.** The current rules can be found in Title 28 of the United States Code Annotated and other legal publications available in many public libraries.

Revised December 16, 1999